## Case No. 12,308.

### In re SANDUSKY.

[17 N. B. R. 452; [1] 10 Chi. Leg. News, 204.]

District Court, S. D. Illinois. 1878.

BANKRUPTCY— PARTNERSHIP— EXECUTION LIEN — EQUITIES OF CREDITORS.

Where an execution lien has been obtained in good faith, before bankruptcy, on the individual property of a member of a partnership firm, under a judgment against the firm, the statutory lien will not yield to the equities of the separate creditors of that partner.

In bankruptcy.

By N. W. BRANSON, Register:

The petition of Thomas Davies, assignee, William Sandusky, creditor, and Abraham Sandusky, the bankrupt, filed in this court on the 28th day of January, 1878, and the answer and cross-petition of Elam Henderson, George H. Holloway, and Jesse R. Holloway thereto, filed February 8, 1878, having been referred to the undersigned register, to take and report the testimony touching the matters in dispute, with my conclusions thereon, I do respectfully report that on the 27th day of February the petitioners appeared by L. H. Bradley, Esq., their attorney, and the respondents and cross-petitioners appeared by N. M. Broadwell, Esq., their attorney, and thereupon it was mutually agreed by and between the said attorneys that the matters in dispute should be submitted for decision upon the papers on file in this matter, without taking any testimony on either side.

The petition alleged in substance that Abraham Sandusky, John C. Short, and Andrew Grundy, partners under the name of John C. Short & Co., made a voluntary assignment, more than six months before the filing of the petition in bankruptcy in this matter, to one Richard T. Leverick, to pay the joint debts out of the joint assets, and the separate debts of the several partners out of the separate assets, and that said Leverick took possession of said individual and partnership property for the benefit of the respective creditors. That the firm of John C. Short & Co. was, as a firm, in partnership with nine other persons in railroad-building, under the firm name and style of H. Sanford & Co., and that the latter firm became largely indebted, and, among other persons, to the respondents herein; and that the respondents recovered a judgment for such debt against H. Sanford & Co. in the Vermillion circuit court; that execution was issued on said judgment and delivered to the sheriff of Vermillion county, by virtue of which said sheriff levied on six hundred fleeces of wool, of the value of seven hundred dollars, as the property of said Abraham Sandusky, claiming and pretending that the same was not the property of the said Leverick, as assignee, and that there had not been a sufficient transfer and change of possession to prevent the levy of said execution; and

[1] [Reprinted from 17 N. B. R. 452, by permission.]

that thereby the respondents attempted to avoid the effect of said assignments, and to appropriate said wool on said execution, instead of allowing it to be appropriated to the individual creditors of Abraham Sandusky. That said Leverick replevined said wool, and that the replevin suit was afterwards dismissed without a trial on the merits. That said Leverick, together with Abraham Sandusky and William Sandusky, executed a replevin bond to the coroner of Vermillion county in the sum of one thousand four hundred dollars, conditioned according to law; that said coroner, for the use of respondents, has brought suit on said bond in the Vermillion circuit court, against Leverick and Abraham and William Sandusky; that Leverick has sold the wool and holds the proceeds to await the determination of said suit, but is ready to turn the same over to this court, if the prosecution of said suit is enjoined; that Abraham Sandusky is indebted to William Sandusky in the sum of forty thousand dollars, and that the latter is equitably entitled to be paid out of the separate estate of Abraham Sandusky, before any part of such estate can be taken on execution to pay the debts of H. Sanford & Co., and that such separate estate is inadequate to pay the separate debts. The petition makes Leverick and Cunningham, the coroner, defendants, and prays for an injunction and an order on Leverick to pay the amount in his hands to the assignee in bankruptcy. An injunction was ordered, and was served on the coroner. Leverick has not been served with papers, nor has he entered his appearance.

The respondents, Henderson and the Holloways, file their answer to cross-petition, and therein allege in substance that said suit on the replevin bond is being prosecuted for their benefit; that the judgment was obtained in their favor for six thousand four hundred and seventy-three dollars and sixty-one cents in 1876, and the levy was made on said wool on the 7th day of August, 1876; that the assignment mentioned in the petition was made on the 16th of October, 1873, and that the wool levied on and replevied was no part of the property of said firm of Short & Co., or of any one of the members of said firm at the time of said assignment, and was not covered by or embraced in the same, but said will was liable to said execution, at the time of said levy, as the property of said Abraham Sandusky. And that the replevin suit was dismissed because Leverick refused and neglected to prosecute the same. And the respondents ask for the dissolution of the injunction. Abraham Sandusky filed his petition for adjudication of bankruptcy against himself and his copartners, in firm of H. Sanford & Co., on the 4th day of January, 1878, and he was adjudicated a bankrupt the same day, and H. Sanford & Co. were adjudicated bankrupts on the 27th day of February, 1878.

This case was submitted on the papers in the case, and a question of law only, and not

one of fact, is presented. It will be noticed that the petitioners do not allege in their petitions that the wool in question was ever reduced into the possession of Leverick, the assignee under the voluntary assignment, or that the title thereto ever, in any manner, passed to him; but, on the contrary, the answer alleges that it was no part of the property of said firm of Short & Co., or of any one of the members of the firm at the time of said assignment, and was not covered by or embraced in the same, but was liable to execution at the time of the levy, as the property of Abraham Sandusky. The assignment was made in October, 1873, the levy was made in August, 1876, and the petition in bankruptcy was filed in January, 1878. Thus, the question that would have been raised if the wool had been levied on while in Leverick's possession, is not presented on these papers; and, under the terms of the submission, I am not to inquire into the facts further than they are presented by the papers on file. The petitioners seek to maintain their injunction upon the familiar rule obtaining in equity and in bankruptcy, that the separate estate of an individual partner cannot be applied towards payment of the partnership debts until after the payment in full of his separate debts. The respondents, on the other hand, contend that the above rule does not obtain in this case, for the reason that they had obtained a specific lien on the property in question, by virtue of the levy of an execution thereon.

I have hunted up and examined the authorities on the question thus presented, with such care as my time would permit. The only case in a court of the United States which I have found in point is the case In re Lewis [Case No. 8,313], decided by Judge Rives, of the United States district court for Western district of Virginia, and affirmed on appeal by Judge Bond, of the circuit court. In that case the court holds that although, in the distribution of the general assets of a bankrupt, the partnership assets are to be first applied to the partnership debts, and the individual assets of any separate partner first applied to his individual debts, according to the terms of the bankrupt law, yet, when a judgment has been obtained by a partnership creditor against the members of a concern, such judgment operates as a several lien against the real estate of each partner; and if prior in point of time to a judgment obtained against an individual partner by an individual creditor of such partner, is to be preferred to such subsequent judgment; but the court is further of the opinion that, when such partnership creditor can get satisfaction of any part of said judgment out of the partnership assets, the pro rata distribution to which such partnership creditor is entitled out of the partnership fund shall first be applied as a credit on said judgment against the separate partner, in relief of the fund of such separate partner, for the benefit of the separate cred-

itor. In the case of Meech v. Allen, 17 N. Y. 300, the New York court of appeals say this: It is a settled rule of equity that, as between the joint and separate creditors of partners, the partnership property is to be first applied to the payment of the partnership debts, and the separate property of the individual partners to the payment of their separate debts, and that neither class of creditors can claim anything from the fund which belongs primarily to the opposite class until all the claims of the latter are satisfied. This, however, is a rule which prevails in a court of equity in the distribution of equitable assets only. Those courts have never assumed to exercise the power of setting aside, or in any way interfering with an absolute right of priority obtained at law. In regard to all such cases, the rule is equitas sequitur legem. 1 Story, Eq. Jur. § 553. In Wilder v. Keeler, 3 Paige, 167, Chancellor Walworth says: "Equitable rules are adopted by this court in the administration of legal assets, except so far as the law has given an absolute preference to one class of creditors over another." So in the case of Averill v. Loucks, 6 Barb. 470, Paige, J., says: "Courts of equity, in the administration of assets, follow the rules of law in regard to legal assets, and recognize and enforce all antecedent liens, claims and charges, existing upon the property, according to their priorities." This is also conceded in the case of McCulloh v. Dashiell, 1 Har. & G. 96, where the whole doctrine of distribution in equity of the joint and separate property of partners is very elaborately examined. Archer, J., says: "At law the joint creditors may pursue both the joint and separate estate of each for the satisfaction of their joint demands, which are at law considered joint and several without the possibility of the interposition of any restraining power of a court of equity." But especially must it be beyond the power of such courts to interfere where an absolute right of legal priority is given by force of a positive statute, as in case of a judgment. Chancellor Walworth, in Mower v. Kip, 6 Paige, 88, says: "The rule of this court is to give effect to the lien of a judgment upon a legal title, so far as it can be enforced by execution at law."

I have thus quoted at large from the opinion of the New York court of appeals, as it is a court of high authority. To the same effect is Straus v. Kerngood, 21 Grat. 584. In New Jersey it is held that the equitable principle above referred to, cannot apply to creditors who have secured their debts by judgment and execution liens. 1 Stockt. [9 N. J. Eq.] 836. The supreme court of Georgia hold that, in cases of co-partnership, the equity in favor of separate creditors will not be enforced to control or take away a right acquired by legal execution on the part of joint creditors against the separate estate. Baker v. Wimpee, 19 Ga. 87; Cleghorn v. Insurance Bank, 9 Ga. 319. In the latter case, Lumpkin,

J., delivering the opinion of the court, says: "The equity in favor of separate creditors will never be enforced to control or take away a right acquired by legal execution on the part of joint creditors against the separate estate." In Wisham v. Lippincott, 1 Stockt. [9 N. J. Eq.] 353, Chancellor Williamson says: "A court of chancery may undoubtedly, where the equities between the parties are to be adjusted and when the assets are before the court, and the court is called upon to marshal them, apply such a rule. I have no hesitation in saying that when a joint creditor of a firm has a judgment and execution levied upon the separate effects of one of the partners, this court ought not, in mere compliance with any such rule as that the separate creditors of each partner are entitled to be first paid out of the separate effects of their debtors, before the partnership creditors can claim anything, to interfere with such execution, either on application of one of the partners or any creditor of the firm, or separate creditor of any of its members." Some cases in New Hampshire would seem to announce the contrary principle, as Crockett v. Cram, 33 N. H. 542; Jarvis v. Brooks, 23 N. H. 136, and Holton v. Holton, 40 N. H. 77. But these cases must be considered in connection with a late decision of the same court (Bowker v. Smith, 48 N. H. 111), which appears to modify the doctrine announced in the earlier cases. In the latter case, Chief Justice Perley, in giving the opinion of the court, and speaking of the equitable doctrine relied on by the petitioner in this case, says: "The grounds on which the doctrine was admitted here afforded no reason for supposing that this right remains to be asserted after the property, once taken for the satisfaction of debts, has been finally appropriated under legal process by levy on the property of the individual partner." The supreme court of South Carolina holds that the private creditors of a partner are entitled to pay out of his separate estate, in preference to partnership creditors, though the latter have recovered judgment against him as surviving partner. Woddrup v. Ward, 3 Desaus. Eq. 203.

Upon consideration of all the authorities upon this point, which I have been able to find, it appears to me that there is a very decided preponderance to the effect that where an execution lien has been obtained, in good faith, before bankruptcy, on the individual property of a member of a partnership firm, under a judgment against the firm, that that statutory lien will not yield to the equities of the separate creditors of that partner. And this is entirely in harmony with the rule which obtains in courts of bankruptcy, that liens generally, including execution liens, which have been acquired in good faith before the commencement of proceedings in bankruptcy, are preserved and enforced. I am therefore of opinion, upon the papers submitted to me in this matter, that the injunction should be dissolved. All of which is respectfully submitted.

TREAT, District Judge. Decision of register affirmed.

SANDUSKY, The (OLMSTEAD v.). See Case No. 10,504.

SANDUSKY SEAT CO. (COMSTOCK v.). See Case No. 3,082.

SANDWICH, The (STEVENS v.). See Case No. 13,409.

SANDY HOOK, The. See Cases Nos. 10,607 and 10,608.

## Case No. 12,309.

### SANDY RIVER BANK v. MERCHANTS', &c., BANK.

[1 Biss. 146.][1]

Circuit Court, N. D. Illinois. Jan. Term, 1857.

BANKS — AUTHORITY OF CASHIER TO SETTLE ACCOUNT.

1. The cashier of a bank, as such, has no authority in another state to settle an account, taking private notes and drafts, and giving a receipt in full. In order to bind the bank, his power must be in the nature of an appointment as agent.

[Cited in Bank of Commerce v. Hart, 37 Neb. 197, 55 N. W. 632. Cited in brief in First Nat. Bank v. Pierce, 99 Ill. 273.]

2. His is a limited authority, and parties claiming a discharge otherwise than by payment must show his authority.

[Cited in Bank of Commerce v. Hart, 37 Neb. 197, 55 N. W. 632.]

The Sandy River Bank, of Farmington, Maine, was established in 1853, with a capital of $50,000. Of this capital a controlling interest, amounting to $38,000, was taken by the owners and managers of the Merchants and Mechanics' Bank of Chicago, the remaining $12,000 being held by parties in Maine. At that time Stephen Bronson was cashier and general financial agent of the Merchants and Mechanics' Bank. Through his engineering, Thomas J. Jones, formerly in a banking house in Chicago, was sent to Farmington to become the cashier of the Sandy River Bank. He assumed his position with the secret understanding that his salary of $850, which was all the Sandy River Bank managers allowed him, was to be increased to $2,000 per annum, the difference to be charged to the Merchants and Mechanics' Bank as "money of Jones." With this secret understanding Jones so managed the affairs of the Sandy River Bank, that the Merchants and Mechanics' Bank of Chicago, had at all times, during the Bronson administration, from $10,000 to $40,000 of the funds of the Sandy River Bank, over and above what appeared upon the books of the latter. In July, 1855, the sum of $22,000 stood charged against the

---

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]